NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0354n.06

Case No. 25-3507

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Aug 07, 2026
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| EVAN A. GALASSO, | ) | |
| Defendant-Appellant. | ) | O P I N I O N |
| | ) | |

Before: McKEAGUE, READLER, and BLOOMEKATZ, Circuit Judges.

McKEAGUE, Circuit Judge. When agents executed a search warrant at Evan Galasso's residence on suspicion that he possessed child pornography, he made incriminating statements prior to receiving *Miranda* warnings. And he later repeated those admissions after he was advised of his rights. The district court excluded some, but not all, of Galasso's statements. Seeing no reversible error, we **AFFIRM**.

**I.**

Based on activity associated with an IP address, federal agents suspected someone at Evan Galasso's residence of using BitTorrent to receive and transmit thousands of files containing child pornography, so they executed a search warrant at the home. With their guns drawn, agents ordered Galasso outside, where he was placed in handcuffs, patted down, and directed toward an FBI vehicle parked on the street within eyesight of the house.

From there, a video camera captures the events in the car, which span about an hour and thirty minutes. FBI Agent Madalyn Oltman kicked off the conversation by asking how Galasso was doing, including whether he was "uncomfortable," to which he responded "yes." Video Part 1, 3:21-3:26.[1] Oltman immediately decided to remove Galasso's handcuffs. She explained "it's just for officer safety that we have to come and do these things" and informed him that he was "not under arrest at the moment." *Id.*, 3:47-3:54. Galasso acknowledged with an "okay," and about two minutes later, the handcuffs were removed. *Id.*, 3:54-5:45. Oltman explained that she and a colleague would clarify "what this is about and stuff." *Id.*, 8:36-8:51. She again asked if Galasso was "okay" or if he needed "water or anything." *Id.*, 8:56-8:58. But she never mentioned arresting Galasso. And at least once during that initial back and forth, Oltman had trouble hearing Galasso.

Eventually, Oltman asked Galasso a question about another person who was in the house. There is disagreement about the response. Galasso says, and the district court credited, that he replied: "I'm sorry, I'm not answering . . . any more questions *without an attorney*. No more questions." R. 23, PageID 157, 161 (emphasis added); *see* Appellant's Br. at 49. But the government claims Galasso never mentioned an attorney at all. And the recording, as far as we can hear, backs up that account. Video Part 1, 9:31-9:41. In either case, Oltman followed up: "It's who? I can't hear you, what?" *Id.* Galasso repeated, "I'm not answering any more questions," again omitting any mention of an attorney. *Id.* That was the first of three attempts by Galasso to end the questioning.

Despite that, in the ensuing minutes, agents asked Galasso additional questions, and he answered. First, Oltman asked if there were any weapons in the house, to which Galasso replied

---

[1] A note about the video. When the district court transmitted the record, the video of Galasso's questioning in the car was provided in a non-standard video format and separated into two files. For ease, this opinion references the non-continuous time stamps for each file.

no. Then, a few minutes later, a different agent asked if there was a way to access Galasso's locked garage. After that, the car remained largely silent for several minutes until Oltman was joined by FBI Agent Matthew Scalisi in the car. The pair made sure Galasso was comfortable with the temperature and didn't need anything, like shoes or other clothing. And they made small talk, touching on how long Galasso had lived in the area and where he grew up.

Galasso shifted the topic of conversation back to the search by asking "what's this all about?" *Id.*, 20:50-20:51. Oltman explained agents obtained "a search warrant for the house" "based on internet activity" and offered to "go through that." *Id.*, 20:52-21:02. Galasso then proceeded to answer a slew of questions about his home's Wi-Fi, the types of devices he used, where they were located, who lived in the house, and what devices they used, before shifting to his understanding and use of BitTorrent to download anime (a type of Japanese animation) on his desktop computer. But he denied downloading any pornography. The parties' tones remained level and calm throughout, and although agents did explain they had "indications" "some things [were] being downloaded" at the house, they did not directly accuse Galasso or mention child pornography. *Id.*, 22:53-23:00. Again, throughout that back-and-forth, Oltman (in the front seat) and Scalisi (who was seated next to Galasso in the backseat) had trouble understanding several of Galasso's hushed answers.

Then, at the 26 ½ minute mark, things changed. When Oltman asked Galasso if there was a specific location Galasso saved his downloaded anime, Galasso declined to answer. For the second time, he said he was "not going to answer any more questions," explaining that he was "obviously accused of something" and did not "think that [he'd] done anything wrong and the rest is up to [the agents]." *Id.*, 26:42-26:59. Oltman didn't back down, flatly asking Galasso if the agents would "find child pornography from BitTorrent?" *Id.*, 27:07-27:13. Galasso answered no.

*Id.*, 27:13. He did admit that he had seen child pornography "years and years ago" on the internet but otherwise denied looking "at that stuff." *Id.*, 27:16-27:48.

At that point, Oltman left the car, and Scalisi asked Galasso what he was "thinking about." *Id.*, 29:11-29:14. He explained that agents would do their "due diligence" and stressed the importance of Galasso's cooperation and "help[ing] [him]self." *Id.*, 29:26-30:23. When Scalisi shifted and asked Galasso how he met his wife, Galasso repeated—for the third time—that he was "not answering any more questions." *Id.*, 30:38-30:46.

Eventually, Oltman returned and explained that an initial investigation suggested Galasso was the "guy with the child pornography." Video Part 2, 5:10-5:25. According to Oltman, the agents were "finding things" and it would be "easier" if Galasso told the truth. *Id.*, 5:25-5:31. Then she and Scalisi put several direct questions to Galasso about child pornography. Galasso initially denied having any illicit material but also responded with some seemingly incriminating answers, including admitting to using BitTorrent to access pornography, "possibly" downloading but subsequently deleting child pornography, and "view[ing] things online." *See, e.g.*, *id.*, 5:36-5:59, 8:20-8:25, 9:21-9:25, 10:45-11:11. At one point, Oltman briefly expressed her concern about hands-on offenses, which Galasso denied. And when Oltman explained that perhaps Galasso had "a problem," and had "seen some things" but deleted them, Galasso responded, "yes ma'am." *Id.*, 10:05-10:13.

The questions wrapped up when Oltman explained that she was "hoping" Galasso would be willing to take a polygraph exam to dispel her "biggest concern" about potential "hands-on offenses." *Id.*, 49:10-49:38. Galasso agreed. Oltman explained that the test was "voluntary" and Galasso was free to drive himself to the FBI office where the exam would be administered. *Id.*, 49:40-50:08. Instead, Galasso chose to drive with the agents. Before they left, Oltman once more

asked if Galasso needed anything, explained that they would drive in her car, and offered to drive Galasso back to his home after the test was completed.

After the voluntary 24-minute drive to the FBI office and a few minutes to pass through a standard security screening, Galasso was led to an interview room. There, FBI Agent Sean Pieja, unarmed and dressed in a suit and tie, advised Galasso of his rights. That process included "multiple" warnings that the questioning was voluntary, discussion of the *Miranda* rights, and an admonition that Galasso could terminate the polygraph questioning at any time he chose. R. 28, Page ID 328, 343-44; R. 22-3, PageID 153; R. 22-2, PageID 152. Galasso was informed point blank that he had "the right to remain silent" and that he had "the right to talk to a lawyer for advice" before being asked any questions. R. 22-3, PageID 153. A polygraph consent form explained the examination was "in connection with . . . [s]exual contact and/or activity with a minor(s)." R. 22-2, PageID 152. Galasso signed that consent form, a separate form laying out his *Miranda* rights, and agreed to proceed. Throughout that process, Galasso never asked for an attorney or to stop the interview.

So Pieja administered the polygraph exam, in which neither Oltman nor Scalisi took part. The process proceeded in several steps. First came the pre-phase, which is "the initial interview . . . with the subject." R. 28, PageID 327. Although the focus of that preliminary discussion was hands-on offenses, Pieja explained that he asked a host of questions, including some about child pornography, as necessary background to ensure that Galasso understood the distinction between a pornography offense and hands-on crime. They covered, for example, how Galasso "got to this stage," his previous sexual behaviors, and whether "he ever produced child pornography." *Id.*, PageID 333, 345. Pieja stated that he "was made aware that [Galasso] had made some admissions regarding why the agents were [at his residence]," that Oltman and Scalisi told him about

"information that [Galasso] may have provided to them at that point," and that the agents had already asked Galasso some questions about downloading child pornography, including "the extent," and "how he did it." *Id.*, PageID 341-42, 350.

Pieja and Galasso's preliminary discussion culminated in a signed confession, in which Galasso admitted viewing child pornography for many years utilizing BitTorrent on his desktop computer. Pieja "type[d] out the statement itself" but then read it aloud to Galasso and had him read it "to make sure [it was] almost like a collaborative document" and "to make sure everything . . . plac[ed] in that document [was] accurate." R. 28, PageID 334-35. Galasso indicated his agreement by signing the confession. Pieja then administered the rest of the polygraph exam, which focused on potential hands-on offenses. Through it all, Galasso did not request an attorney, refuse to answer any of Pieja's questions, or otherwise ask to stop the interview.

Galasso was indicted for receiving, distributing, and possessing child pornography. He moved to suppress the statements he made to law enforcement, both in the car and at the FBI office. The district court agreed in part. Starting with the questioning in the car, the district court found that Galasso was not in custody for the initial 26 ½ minutes of the encounter. But it suppressed the remainder of Galasso's statements in the car, finding "that no reasonable person would have felt free to terminate the interrogation" after that point. R. 23, PageID 164. As for the questioning at the FBI office, the district court determined that Galasso waived his *Miranda* rights and his earlier, unwarned admissions did not taint his warned, incriminating statements.

Ultimately, Galasso pled guilty to receiving and distributing child pornography, reserving the right to appeal the partial denial of his suppression motion. He was sentenced to 180 months' imprisonment and then filed this appeal.

**II.**

The Fifth Amendment prohibits a defendant from being "compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. To safeguard that right, *Miranda v. Arizona*, 384 U.S. 436 (1966), established certain "judicial rules of the road for officers who interrogate individuals in police custody." *United States v. Potter*, 927 F.3d 446, 449 (6th Cir. 2019). Among them, officers must warn an individual they have the right to remain silent and to speak with an attorney. *Miranda*, 384 U.S. at 444. And, as a general rule, courts give those prophylactic requirements teeth by suppressing a defendant's unwarned statements. *See, e.g.*, *Oregon v. Elstad*, 470 U.S. 298, 307 (1985).

Against that backdrop, Galasso makes three suppression arguments: that (1) his statements while in the car at his residence were elicited while he was in custody and without *Miranda* warnings, (2) his subsequent post-warning statements at the FBI office were tainted by his pre-warning admissions, and (3) both sets of statements were obtained after he invoked his right to counsel. Because each of Galasso's arguments concern the district court's denial of his motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Guerrero*, 168 F.4th 454, 459-60 (6th Cir. 2026) (citing *United States v. Zabel*, 35 F.4th 493, 501 (6th Cir. 2022)). And, in this posture, the findings of fact are viewed in the light most favorable to the government. *Id.*

**A.**

Start with Galasso's statements during the first 26 ½ minutes in the car. Recall that, during that time, Galasso answered several potentially incriminating questions, including admitting that he used BitTorrent. To his mind, his initial statements should have been suppressed because he was not given *Miranda* warnings. Yet he later provided much the same answers when asked

questions at the FBI office. As we explain below, Galasso was properly Mirandized at that point, so his later statements are admissible. And that conclusion prompts a question, one that we probed at argument: Can we assume, without deciding, that Galasso was in custody the entire time he was in the car because any resulting error in failing to suppress his initial statements was harmless?[2]

Even if "a defendant manages to exclude . . . evidence on appeal following a conditional plea of guilty" that does not necessarily mean "he is entitled to withdraw his plea." *United States v. Leake*, 95 F.3d 409, 420 n.21 (6th Cir. 1996). Instead, when a defendant partially prevails, we must "examin[e] the degree of success and the probability that the excluded evidence would have had a material effect on the defendant's decision to plead guilty." *Id.* Other circuits have recognized as much, although they have articulated differing standards. *See, e.g.*, *United States v. Dyer*, 54 F.4th 155, 160-61 (3d Cir. 2022) (asking if erroneously admitted evidence contributed to defendant's plea calculus based on "a reasonable, objective examination of the evidence," not "an assessment of the actual mental state of a defendant"); *United States v. Lustig*, 830 F.3d 1075, 1088 (9th Cir. 2016) (asking if there was a "reasonable possibility" that erroneously admitted evidence "contributed to [the defendant's] decision to plead guilty" (citation modified)); *United States v. Peyton*, 745 F.3d 546, 557 (D.C. Cir. 2014) (determining there was "a high probability that the excluded evidence would have had a material effect on [the defendant's] decision to plead

---

[2] Of course, we prompted this question, not the government. But we can sometimes raise the issue of harmless error sua sponte. *United States v. Butts*, 40 F.4th 766, 774 (6th Cir. 2022); *Gover v. Perry*, 698 F.3d 295, 300-01 (6th Cir. 2012); *United States v. Lester*, 98 F.4th 768, 780 (6th Cir. 2024) (White, J., concurring) (raising harmless error sua sponte to avoid *Miranda* question). And that makes sense here, as "the harmlessness of the error . . . is certain" and taking the harmless error path will prevent "ultimately futile proceedings in the district court." *Gover*, 698 F.3d at 300 (citation modified). Of course, we must be "conscious of the dangers of prejudice inherent in the defendant's inability to defend against a harmless-error argument," *Butts*, 40 F.4th at 774 (citing *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1101 (9th Cir. 2005)), but that concern is mitigated here because the parties had an opportunity to brief the harmless error issue after argument.

guilty" (citation modified)); *United States v. Benard*, 680 F.3d 1206, 1213 (10th Cir. 2012) (asking if "there is a reasonable possibility that the error contributed to the plea" (citation modified)).

No matter the proper framing, we can assume without deciding that Galasso was in custody during the first portion of the encounter. That's because even if "all of [Galasso's] statements while inside the police vehicle" were suppressed but "his subsequent statements while at the FBI office later that same morning" were admitted, Galasso concedes "he would not be inclined [to] withdraw his previously[] entered plea of guilty." *See* Appellant's Letter Brief at 4. With that admission, he dispels any "reason to think [his statements in the car] made any difference." *Benard*, 680 F.3d at 1217 (Gorsuch, J., concurring in part and dissenting in part). On this record, Galasso's post-argument concession is evidence enough that his initial statements had no "material effect on [his] decision to plead guilty." *Leake*, 95 F.3d at 420 n.21; *United States v. Latz*, 162 F. App'x 113, 121-22 (3d Cir. 2005). So it doesn't matter whether Galasso was in *Miranda* custody while in the car, and we need not reach that otherwise close question (or wade into why the district court drew the custody line at 26 ½ minutes). *See United States v. Sherman*, 168 F.4th 417, 432 (6th Cir. 2026). And we leave for another day the task of further defining the appropriate harmlessness standard. *See United States v. Maund*, 167 F.4th 941, 952 (6th Cir. 2026) ("We need not decide definitively which standard should apply here, because we can assume without deciding that the most stringent standard for harmless-error review applies." (citation modified)).

**B.**

The focus, then, is on Galasso's statements during the later interrogation at the FBI office. After being Mirandized, Galasso acknowledged, for example, that he had been "download[ing] [child pornography] since [he] was fourteen years old" and "utilized torrents to download and view [child pornography]" on his "desktop computer." R. 22-4, PageID 154.

Those statements are admissible. Generally, once a defendant is Mirandized, his statements are fair game. *Elstad*, 470 U.S. at 308-09. Of course, that rule does not necessarily hold when officers elicit incriminating statements, provide *Miranda* warnings, and then elicit the same inculpatory information. *See Missouri v. Seibert*, 542 U.S. 600, 611-14 (2004) (plurality opinion). In that situation, the "post-warning statements remain admissible if the *Miranda* warnings nevertheless functioned effectively," that is "if the warnings informed the suspect that he had a genuine choice to continue speaking." *United States v. Woolridge*, 64 F.4th 757, 760 (6th Cir. 2023) (citing *Seibert*, 542 U.S. at 611-12 & n.4). Several considerations help gauge whether that is the case: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615; *United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015) (adopting the *Seibert* plurality's objective test as the law of our Circuit).

With those factors in mind, the *Miranda* warnings given to Galasso prior to the polygraph exam did the job. To start, Galasso accompanied the agents voluntarily to the FBI office. The first and second round of questions were separated by at least half an hour and a significant change in location. *See, e.g.*, *Woolridge*, 64 F.4th at 762 (finding fifteen minutes sufficient). Different agents were involved in each, with Oltman and Scalisi leading the first round of questions and Pieja the second. Of course, all the agents were employed by the same agency, but Pieja was not involved with the search. So, this is not a case where "the same officers conducted the interrogation in the same location without any break between the two sets of questions." *United States v. Pacheco-Lopez*, 531 F.3d 420, 427 (6th Cir. 2008). *Contra Guerrero*, 168 F.4th at 464 ("[T]he transition

from unwarned to warned questioning occurred without any break or location change" and "the same agents arrested him and conducted both sets of questioning").

And while Galasso was asked common questions, the two interrogations were not an exact match in content or detail. The district court concluded as much, finding that the questioning had "minimal overlap." R. 23, PageID 167. And Pieja's testimony suggests his interrogation was far more detailed and wide ranging, including how Galasso "got to this stage," his previous sexual behaviors, and whether "he ever produced child pornography." R. 28, PageID 333. More to the point, the later questioning focused on hands-on offenses, a topic barely broached by Oltman. Against all that evidence, Galasso did not take the opportunity at the evidentiary hearing to develop what exactly Oltman and Scalisi told Pieja about the first round of questioning. Without more, and viewing the record in the government's favor, there is insufficient evidence to suggest the district court erred in concluding that the interview at the FBI office did not significantly overlap with the questioning in the car. *Guerrero*, 168 F.4th at 459-60.

Galasso finds some support in *United States v. Ashmore*, 609 F. App'x 306 (6th Cir. 2015), *Pacheco-Lopez*, and *United States v. Ray* ("*Ray II*"), 690 F. App'x 366 (6th Cir. 2017). As in those cases, some of the questions put to Galasso by Pieja were no doubt "relevant" to the child pornography charges, *Ashmore*, 609 F. App'x at 317, seem to be based (at least in part) on "knowledge gleaned during the initial questioning," *Pacheco-Lopez*, 531 F.3d at 428, and amplified Galasso's earlier admissions, *Ray II*, 690 F. App'x at 373-74. But again, at the evidentiary hearing, when Pieja testified that he learned some information from the other agents, Galasso did not drill down into specifics to establish exactly what Pieja learned and how he used that information.

And even setting that aside, there were other reasons to doubt the effectiveness of the *Miranda* warnings in those cases. The first pair, for example, involved questions by the same law enforcement officer with little or no spatial or temporal gap. *See Ashmore*, 609 F. App'x at 317; *Pacheco-Lopez*, 531 F.3d at 427. And while *Ray II* (which does not bind the panel in any event) involved a comparable break in time and location, the questioning in that case was conducted by officers who were "intimately involved" with the search that occurred during the initial questioning. 690 F. App'x at 375. Other coercive tactics were at play too, not least that the defendant was "handcuffed . . . with his face to the wall" during the first round of questions before being brought involuntarily to the station. *Id.* at 368, 374. Those aggravating indicators are absent here. Certainly, none of *Ashmore*, *Pacheco-Lopez*, or *Ray II* involved a defendant who was afforded a choice to accompany agents to a new location for further questioning.

More to the point, even if the overlapping and derivative nature of the questions favors Galasso, the "*Seibert* plurality did not condemn us to a mechanical counting of items on a list." *Woolridge*, 64 F.4th at 761 (citation modified). Instead, the analysis "hinges on whether 'a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, and whether the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.'" *Ray*, 803 F.3d at 272-73 (alterations omitted) (quoting *Seibert*, 542 U.S. at 616).

By all indications, that was the case for Galasso, and comparing this case to *Elstad* and *Seibert* provides confirmation. Michael Elstad made unwarned, incriminating statements at his home after officers suggested he may have been involved with a robbery. *Elstad*, 470 U.S. at 301-02. He repeated those admissions in more detail an hour later after being transported to the police station and Mirandized. *Id.* Because Elstad was informed of his rights and nothing suggested his

subsequent choice to speak with officers was involuntary, his unwarned confessions—although in violation of *Miranda*—did not taint his later admissions. *Id.* at 314-18.

*Seibert* was different. Officers approached Patrice Seibert early in the morning at a hospital where her son was being treated for burns. *Seibert*, 542 U.S. at 604. After arresting her and transporting her to the station house, officers coerced a confession by "squeezing her arm" and employing "systematic, exhaustive" questioning "managed with psychological skill." *Id.* at 604-05, 616. Then, with "little, if anything, of incriminating potential left unsaid," the same officer, in the same place gave Seibert the *Miranda* warnings and referenced her earlier admissions in leading her to confess again. *Id.* at 616. On those facts, "it would have been unnatural to refuse to repeat at the second stage what had been said before." *Id.* at 617.

Galasso's questioning looks more like *Elstad* and less like *Seibert*. To start, unlike either *Elstad* or *Seibert*, Galasso made the choice to accompany the agents to the FBI office. *Cf. Elstad*, 470 U.S. at 300-01; *Seibert*, 542 U.S at 604-05. When he arrived, he was advised of his *Miranda* rights and reminded "multiple times" that the questioning was voluntary. R. 28, PageID 328. By any measure, Pieja offered a "careful and thorough administration of [the] *Miranda* warnings." *Elstad*, 470 U.S. at 310-11. And it was only after that repeated and "undeniably complete" explanation that Galasso chose to continue. *Id.* at 314. Indeed, on appeal, Galasso does not take issue with the thoroughness of the warnings. And the "fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." *Id.* at 318. True, Oltman and Scalisi earlier explained that Galasso's cooperation would be helpful down the line and make things easier. But that prompting does not look like the type of threat, abuse, or promise that would render Galasso's statements involuntary. *Cf. Bobby v. Dixon*, 565 U.S. 23, 29 (2011) (per curiam) ("During Dixon's first interrogation, he received several breaks, was given water and offered food,

and was not abused or threatened."); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("Instead of pressuring Alvarado with the threat of arrest and prosecution, [an officer] appealed to his interest in telling the truth and being helpful to a police officer."); *Oregon v. Mathiason*, 429 U.S. 492, 493 (1977) (per curiam) (defendant was told "that his truthfulness would possibly be considered by the district attorney or judge").

Other data points bolster the conclusion. Galasso does not suggest that Pieja leveraged his earlier admissions to extract a confession during the polygraph exam. *Compare Elstad*, 470 U.S. at 316, *with Seibert*, 542 U.S. at 616-17. While Pieja may have learned some information from the other agents, he did not know the full extent of the questioning and there is no indication his later questions referenced the admissions procured by Oltman or Scalisi. *Guerrero*, 168 F.4th at 464 (noting the "absence of language suggesting that officers were seeking to clarify or expound on prior statements"). And though the second interview addressed topics beyond hands-on offenses, which is more than Galasso was told at the outset, Pieja convincingly explained why addressing child pornography was necessary to effectively administer the exam. In the end, the district court credited Pieja's testimony that he treated the second round of questioning as a "separate interview," R. 23, PageID 167, and the record offers little reason to doubt that conclusion. *See Woolridge*, 64 F.4th at 762.

All in all, a reasonable defendant would not have viewed Pieja's questioning "as part of one sequence," such that the subsequent *Miranda* warnings were futile. *Pacheco-Lopez*, 531 F.3d at 427-28. The district court properly denied Galasso's request to suppress his post-*Miranda* statements.

**C.**

Finally, Galasso argues that all of his statements—both in the car and at the FBI office—must be suppressed because Oltman disregarded his unambiguous assertion that he did not want to answer questions without an attorney. To be sure, when a defendant invokes his right to counsel, officers must stop questioning until an attorney is present or the defendant reinitiates the conversation. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

But that protection was not triggered here. That's because a defendant's request for counsel must be unambiguous. *Davis v. United States*, 512 U.S. 452, 459 (1994). Said differently, a defendant "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* And Galasso did not do so here. To start, the recording of the questioning does not support the district court's conclusion (or Galasso's assertion) that he even said the word attorney.

But even if Galasso stated that he was "not answering any more questions without an attorney," the district court found that Oltman did not hear that invocation. R. 23, PageID 157, 161. On that version of the facts, Galasso did not invoke his right to counsel because Oltman "could not have objectively understood a statement [she] did not hear to be an assertion of the right to counsel." *United States v. Dudley*, 804 F.3d 506, 513 (1st Cir. 2015); *Hyatt v. Branker*, 569 F.3d 162, 170 (4th Cir. 2009) (similar). In the end, if "the mere mention of an attorney does not cut it," an inaudible request certainly can't. *Potter*, 927 F.3d at 451.

Galasso's reliance on *United States v. Worster*, 607 F. Supp. 3d 173 (D.R.I. 2022) doesn't change things. Recognizing the objective nature of the *Davis* inquiry, the *Worster* district court discounted an officer's subjective assertion that she had not heard a defendant's request for an attorney. *Id.* at 181 (citing *Davis*, 512 U.S. at 458-59). But that was because the facts indicated a

reasonable officer would have understood the defendant's invocation. *See id.* There are no such objective indications here. Quite the opposite, Galasso's assertion is inaudible on the recording. And both Oltman and Scalisi repeatedly strained to make out Galasso's muffled statements.

And if that weren't enough, Galasso conceded below that if Oltman did not hear his assertion, his invocation was insufficient to trigger the *Edwards* bar. As it turns out, the district court did credit Oltman's testimony that she was unable to make out Galasso's statement. On appeal, Galasso has pointed to no evidence suggesting that factual finding was clearly erroneous. *United States v. Dillard*, 438 F.3d 675, 681 (6th Cir. 2006) (affording deference to district court's assessment of officer's credibility during a suppression hearing).

## III.

Galasso's statements in the car—whether properly admitted or not—did not affect his decision to plead guilty, his later statements do not run afoul of *Miranda*, and he did not invoke his right to counsel. As a result, we **AFFIRM.**